*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1471**

State of Minnesota,
Respondent,

vs.

Kelci Marie Meyers,
Appellant.

**Filed October 27, 2025
Affirmed
Worke, Judge**

Ramsey County District Court
File No. 62-CR-24-979

Keith Ellison, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Catherine Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Worke, Judge; and Johnson, Judge.

**NONPRECEDENTIAL OPINION**

**WORKE**, Judge

Appellant challenges the sufficiency of the evidence supporting her conviction for aiding-and-abetting attempted second-degree murder, first-degree assault, and drive-by

shooting of an occupied building. Appellant also argues that the prosecutor committed misconduct in closing argument. We affirm.

## FACTS

Appellant Kelci Marie Meyers moved next door to T.H. in 2023. Meyers and T.H. were initially friendly, but there were conflicts between T.H. and one of Meyers's roommates. The conflicts continued to escalate, resulting in police intervention. T.H. filed for a harassment restraining order against Meyers's roommate in early October 2023. Later that month, Meyers and her roommates were evicted. Meyers then began dating Morris Ryan. The two moved in together in late November 2023.

Shortly before midnight on December 31, 2023, security cameras showed Meyers driving Ryan's black GMC Yukon past T.H.'s home with Ryan in the passenger seat. The footage showed Meyers driving past the front of T.H.'s home twice, which was dark, and past the back of the home twice, which had lights on in the kitchen. During the second time past the back of the home, Meyers stopped for about 13 seconds while aligned with T.H.'s backyard, and Ryan shot 14 times into the lit kitchen window. T.H.'s son was hit by two bullets in his lower abdomen.

Immediately after the shooting, additional security-camera footage showed Meyers driving the Yukon to a gas station. The footage shows Meyers and Ryan selecting drinks and kissing.

During their investigation into the shooting, police executed a search warrant at Meyers and Ryan's home. Police recovered a semi-automatic 9mm pistol and ammunition.

2

Testing showed that casings recovered by police behind T.H.'s house were from this firearm. Additionally, Meyers's DNA was located on the gun.

Meyers told law enforcement that she was home on New Year's Eve and only left in the Yukon with Ryan to pick up her sister. Meyers denied going to T.H.'s home on New Year's Eve. Meyers stated that T.H. "wasn't so cool," and did not get along with one of Meyers's roommates. Meyers also acknowledged her romantic relationship with Ryan. After investigators confronted Meyers with evidence of her driving, Meyers admitted to driving that evening and going to the gas station; but otherwise, she had no response.

Meyers made phone calls in jail to her mother and a friend that were recorded. She stated that Ryan would take the blame for the shooting. Meyers's mother told Meyers to tell the police that she was driving but did not know "what was happening." In that same call, Meyers stated that she drove through the alley twice at Ryan's direction.

Respondent State of Minnesota charged Meyers with aiding-and-abetting attempted second-degree murder, first-degree assault, and drive-by shooting of an occupied building.

At her jury trial, Meyers testified that she knew that Ryan carried a gun, and that she was generally not allowed to touch it unless Ryan asked her to carry it in her purse. Regarding events surrounding the shooting, Meyers testified that she was confused as to why Ryan rolled down the car window and told her to keep her eyes forward, and that she was scared and confused. Meyers testified that, while they were at the gas station, Ryan told her to act normally and made her kiss him. Meyers admitted that she did not call the police and that she lied during the police interview. During closing argument, the

3

prosecutor stated that Meyers drove to the rear of the house, and Ryan shot at the kitchen window, because they knew people were in the kitchen and "intended to kill someone."

The jury found Meyers guilty as charged. The district court sentenced Meyers to 183 months in prison. This appeal followed.

## DECISION

### *Sufficiency of the evidence*

Meyers argues the evidence is insufficient to sustain her convictions, claiming that the state failed to prove she intended to aid Ryan. Intent is generally proved circumstantially by drawing inferences from the defendant's words and actions, considering the totality of the circumstances. *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997). "Circumstantial evidence is entitled to the same weight as direct evidence; however, if a conviction is based on circumstantial evidence, a higher level of scrutiny is warranted." *Bernhardt v. State*, 684 N.W.2d 465, 477 (Minn. 2004). When a conviction rests on circumstantial evidence, appellate courts conduct a two-part analysis to determine the sufficiency of the evidence. *State v. Culver*, 941 N.W.2d 134, 143 (Minn. 2020).

First, appellate courts identify the circumstances proved by the state, giving deference to the fact-finder's "acceptance of the [s]tate's evidence and its rejection of any evidence in the record that is inconsistent with the circumstances proved by the [s]tate." *Loving v. State*, 891 N.W.2d 638, 643 (Minn. 2017). Second, appellate courts "determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than guilt." *Id.* (quotation omitted). At this stage, appellate courts no longer defer to the fact-finder; they engage in an independent examination of the

reasonableness of the inferences. *State v. Palmer*, 803 N.W.2d 727, 733 (Minn. 2011). An appellate court will uphold the conviction when the "circumstantial evidence" form "a complete chain that [] leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted). We will reverse if there is any other reasonable inference other than guilt. *Loving*, 891 N.W.2d at 643. "[W]e will not overturn a guilty verdict on conjecture alone." *State v. Stewart*, 923 N.W.2d 668, 673 (Minn. App. 2019) (quotation omitted), *rev. denied* (Minn. Apr. 16, 2019).

Meyers first argues that the evidence fails to establish that she knew Ryan was going to commit the underlying crimes.

"A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2022). A defendant "intentionally aids" an offense if they "knew [their] alleged accomplices were going to commit a crime," and "intended [their] presence or actions to further the commission of that crime." *State v. Segura*, 2 N.W.3d 142, 156 (Minn. 2024) (quotation omitted). The jury may infer the individual's state of mind through various circumstances, including "presence at the scene of the crime, a close association with the principal before and after the crime, a lack of objection or surprise under the circumstances, and . . . flight from the scene of the crime with the principal." *Id.* (quotation omitted).

5

Viewing the record in the light most favorable to the jury's verdicts, the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt. The circumstances proved include:

1) Meyers had prior conflicts with the occupants of T.H.'s home, which resulted in the issuance of an HRO and eviction;

2) Meyers drove Ryan in his vehicle to T.H.'s home, with Ryan in the front passenger seat;

3) Meyers knew Ryan carried a gun and would occasionally carry it for him;

4) T.H.'s home was unlit except for the kitchen windows overlooking the backyard;

5) Meyers drove around T.H.'s home twice before stopping next to T.H.'s backyard;

6) Meyers aligned the vehicle with T.H.'s kitchen windows;

7) While Meyers was stopped, Ryan shot 14 rounds at the home with ten rounds hitting the kitchen window;

8) T.H.'s son sustained a life-threatening injury to his abdomen from the shooting;

9) After the shooting, Meyers and Ryan went to a gas station where they shared a kiss;

10) The pair returned to their shared apartment;

11) The gun used was found in the couple's home and contained Meyers's DNA; and

12) Meyers stated Ryan would take the blame in multiple recorded jail calls.

These circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt.

6

Meyers argues that, because the state was unable to explain Ryan's motive for the shooting, it is difficult to reasonably infer that she knew he was going to commit the shooting. We disagree. It was reasonable for the jury to infer Meyers's state of mind from the circumstances proved because of her presence at the crime scene, her close association with Ryan, her lack of objection or surprise under the circumstances, and her flight from the crime scene with Ryan. *See Segura*, 2 N.W.3d at 156. The circumstances proved reasonably support the jury's verdict and fails to support any alternative hypothesis. Meyers's argument that there was insufficient evidence to uphold the conviction because the state failed to prove Ryan's state of mind for the shooting fails for the same reason—a jury could reasonably infer, by the evidence proven, Meyers's and Ryan's requisite intent.

Meyers also argues that the evidence is insufficient because the state failed to prove Ryan's intent to harm or kill. Given our previous analysis, a jury could reasonably infer that Ryan had the intent to harm or kill when he shot at the only lighted room of an occupied dwelling.

### *Liability under Minn. Stat. § 609.05, subd. 2*

The evidence demonstrates that Ryan committed attempted second-degree intentional murder. Meyers is liable for this crime under Minn. Stat. § 609.06, subd. 2, even if she did not specifically know that Ryan would attempt to commit it because it is reasonably foreseeable that shooting at a home would involve the actor's specific intent to kill another.

If a person is liable for an offense committed by another under Minn. Stat. § 609.05, subd. 1, their liability extends to "any other crime committed in pursuance of the intended

7

crime if reasonably foreseeable by the person as a probable consequence of committing or attempting to commit the crime intended." Minn. Stat. § 609.05, subd. 2 (2022). This subdivision does not establish an independent state-of-mind requirement for the charged crime; instead, it establishes liability for any reasonably foreseeable crime committed in pursuit of the intended crime. *McAllister*, 862 N.W.2d at 58. Reasonable foreseeability concerns whether a defendant could have reasonably foreseen the unintended crime, not whether the defendant could accurately predict it, and that the standard is objective, even though it is based only on "what would be reasonably foreseeable to a person in the defendant's shoes." *Id.* at 57-58.

Here, the evidence was sufficient to establish Meyers's guilt under the theory of extended liability because the circumstances proved show she intended to aid in the drive-by shooting and the intentional death of someone inside was a reasonably foreseeable consequence of Ryan shooting at the house. Meyers's driving conduct during the night of the shooting appeared measured and deliberate. Meyers drove by the house multiple times before positioning the vehicle in view of a well-lit kitchen. It would be reasonably foreseeable to someone in Meyers's shoes that if Ryan fired a gun several times at the home, someone inside would be injured or killed. We conclude the evidence was sufficient to sustain Meyers's convictions.

***Prosecutorial misconduct***

Meyers next argues that the prosecutor committed prejudicial misconduct during closing argument by stating that Ryan shot at the back of the home because he and Meyers

knew people were in the kitchen. Meyers argues that this statement is not based on any reasonable inferences from the evidence presented at trial.

Because this claim was not objected to at trial, we apply the modified plain-error analysis. *State v. Portillo*, 998 N.W.2d 242, 248 (Minn. 2023). Under the modified plain-error analysis, Meyers must show that the prosecutor's conduct constituted error that was plain. *Id*. If Meyers shows plain error, "the burden then shifts to the [s]tate to demonstrate that the error did not affect the defendant's substantial rights." *Id.* (quotation omitted). Even if the unobjected-to error was plain and affected Meyers's substantial rights, we "will not grant relief to correct the error unless our failure to do so will cause the public to seriously question the fairness and integrity of our judicial system." *Pulczinski v. State*, 972 N.W.2d 347, 359 (Minn. 2022).

Meyers argues that the prosecutor committed misconduct by relying on evidence that did not support a reasonable inference that she, or Ryan, knew that the kitchen was occupied. "A prosecutor's closing argument should be based on [the] evidence presented at trial and inferences reasonably drawn from that evidence." *State v. Bauer*, 776 N.W.2d 462, 475 (Minn. App. 2009) (quotation omitted), *aff'd,* 792 N.W.2d 825 (Minn. 2011). To determine whether the prosecutor committed misconduct in closing argument, we examine "the closing argument as a whole, rather than just selective phrases or remarks that may be taken out of context or given undue prominence." *State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993).

Here, much of the trial was based on evidence that Meyers drove by T.H.'s home twice before stopping and aligning the vehicle with the lit kitchen window. In reviewing

the circumstances proved, the prosecutor's closing argument relied on permissible, reasonable inferences drawn from the evidence. Therefore, the prosecutor did not commit misconduct.

### Substantial rights

Even if we were to assume that the prosecutor engaged in misconduct, the plain error did not affect Meyers's substantial rights. Prosecutorial misconduct affects a defendant's substantial rights "if there is a reasonable likelihood that the absence of misconduct would have had a significant effect on the jury's verdict." *State v. Davis*, 735 N.W.2d 674, 681-82 (Minn. 2007). To determine whether there is a reasonable likelihood the prosecutor's error had a significant effect on the verdict, we "consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity (or made efforts to) rebut the improper suggestions." *Id*. at 682.

Meyers's state of mind was a primary issue throughout trial. Defense counsel's closing argument focused on rebutting the state's claims of Meyers's knowledge and intent before the shooting occurred. The jury, after weighing the evidence presented, was not persuaded by Meyers's arguments.

The prosecutor's characterizations of the evidence, even if they constituted plain error, did not affect Meyers's substantial rights because the circumstances established at trial provide a reasonable inference that she had the intent to aid and abet Ryan. Therefore, Meyers's substantial rights were not significantly affected.

**Affirmed.**